[No. B231123. Second Dist., Div. Six. Dec. 17, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES C. LUJAN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

## COUNSEL

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOFFSTADT, J.**\*—In *Maryland v. Craig* (1990) 497 U.S. 836 [111 L.Ed.2d 666, 110 S.Ct. 3157] (*Craig*), the United States Supreme Court held that a child abuse victim could testify by closed-circuit television under certain circumstances without violating the criminal defendant's right to confront witnesses. In the published portion of our decision, we hold that the same rule applies to a child witness who is not a victim. We also hold that California courts have the inherent authority to order remote testimony in these circumstances.

### FACTS AND PROCEDURAL HISTORY

### I. Offense Conduct

#### A. *Lena*

In the spring of 2006, James C. Lujan was dating Stacy B. When Lujan, Stacy B. and her 17-month-old daughter Lena started living together in a converted garage, Lena was a "very happy" and healthy toddler. Over the next several weeks, that changed. Lujan's family members and others noticed bruises on Lena's shoulder blades, head, neck and chest. They saw she had a black eye and that her fingertips were burnt and red. Lujan told a friend that the injuries to Lena's shoulder blades looked like they were made with "a fucking stick." Others noticed that Lena seemed frightened of Lujan. They saw him swaddle Lena tightly like a "burrito" and put a blanket over her head. They also saw Lujan put Tabasco sauce on Lena's tongue, which became blistered and swollen.

On the morning of June 12, 2006, Stacy B. left Lena with Lujan. Lujan wanted to go with his brother to a flower show, but could not because he was watching Lena. When his attempts to reach Stacy B. failed, Lujan said he became "frustrated" and "hella mad." When Stacy B. returned that afternoon, Lena had a seizure and difficulty breathing. Responding emergency paramedics dislodged an almond from Lena's throat, but she still struggled to breathe.

By the time she arrived at the emergency room, Lena was "near death." The emergency room doctor testified that Lena displayed "classic" symptoms of shaken baby syndrome—namely, bleeding in the brain and bleeding behind the eyes. The injuries had been inflicted within the prior 48 hours. Both of

---

\*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Consitution.

Lena's collarbones were broken, likely caused by a "significant" downward hit directly on those bones.

## B. *Diego*

Three years later, Lujan was living with Meagan D. She had two children, five-year-old Vanessa and four-year-old Diego. Although Lujan was good to Diego at first, by the time they moved into the Budget Motel in Lompoc in mid-July 2009, things had started to deteriorate. Lujan would bite Diego's fingertips and feed him Tabasco sauce. If Diego upset him, Lujan would make Diego stand in the corner with his arms up, head back and knees bent. When the stance became painful and Diego cried, Lujan would call Diego a "little bitch," a "little baby," a "piece of shit." He would also punch him in the sides, back and stomach, and kick him in the back of the legs. These beatings, which both Meagan D. and Vanessa witnessed, occurred on July 16 or 17. By the morning of July 18, Diego displayed flu-like symptoms. Meagan D. called 911. Lujan left the motel as soon as she did so.

Diego died hours later. The cause of death was blunt force trauma to the abdomen that ruptured the connection between his stomach and small intestine, causing stomach contents to spill into his abdominal cavity. The autopsy also revealed that Diego had 128 bruises all over his body, including his arms, legs, back, chest, stomach, head and penis.

## II. Charges

The state charged Lujan with torturing Lena and Diego, in violation of Penal Code section 206.[1] As to Diego, the state also charged Lujan with second degree murder, in violation of section 187, subdivision (a), and with child abuse causing death, in violation of section 273ab, subdivision (a).[2]

## III. Procedures Regarding Remote Testimony

The trial court allowed Vanessa, age seven at time of trial, to testify over a two-way, closed-circuit television. Vanessa sat in a separate room from which Lujan, his attorney, the district attorney and the jury could see her on a video monitor. Vanessa could view a monitor that showed everyone in the courtroom except Lujan. The judge admonished the jury not to place any weight on the use of the closed-circuit television procedure. Before allowing this procedure, the judge heard testimony from family therapist Virginia Rohen

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] Lujan was also charged with willfully inflicting corporal injury on Meagan D., in violation of section 273.5, subdivision (a). The jury acquitted him of that charge.

and Lompoc Detective Suzie Aanured. The judge thereafter found that remote testimony was "necessary for the protection of [Vanessa] because she would be unable to testify in front of [Lujan] because of fear or that [she] would suffer emotional trauma from testifying in open court."

## IV. Verdict and Sentencing

The jury convicted Lujan of all charges with respect to Lena and Diego. The trial court sentenced him to 64 years to life, plus 11 years.

## DISCUSSION

### I. Remote Testimony of Vanessa

Lujan mounts a three-pronged attack on the court's ruling allowing Vanessa to testify by closed-circuit television (TV). First, he argues that *Crawford v. Washington* (2004) 541 U.S. 361 [158 L.Ed.2d 177, 24 S.Ct. 1354] (*Crawford*) changed the meaning of the confrontation clause and always entitles a criminal defendant to face his accusers. Second, Lujan contends that, even if *Crawford* does not confer an absolute right to face-to-face confrontation, the United States Supreme Court has at most tolerated remote testimony by child witnesses who are victims of a crime. (*Craig, supra*, 497 U.S. 836.) Extending *Craig* to children who are merely witnesses, Lujan posits, goes too far. Lastly, Lujan asserts that the trial court lacked authority to order two-way, video testimony because the statutory procedures for remote testimony by children set forth in section 1347 apply only to child witnesses who are victims of certain crimes.

### A. Crawford *Did Not Overrule Precedent Governing When In-court Testimony Is Required*

■ Our Supreme Court recently rejected the argument that *Crawford* modified the United States Supreme Court's approach to determining when face-to-face testimony is required. (*People v. Gonzalez* (2012) 54 Cal.4th 1234 [144 Cal.Rptr.3d 757, 281 P.3d 834].) The Court reasoned that "*Crawford* and its progeny are limited to 'testimonial' *hearsay* statements, and say nothing about whether a witness who testifies *in person* must face the defendant." (*Id.* at p. 1266.)

### B. *When Necessary, Nonvictim Child Witnesses May Testify Remotely*

■ In general, the confrontation clause guarantees a criminal defendant "a face-to-face meeting with witnesses appearing before the trier of fact. [Citation.]" (*Coy v. Iowa* (1988) 487 U.S. 1012, 1016 [101 L.Ed.2d 857,

108 S.Ct. 2798] (*Coy*).) But this rule has never been absolute. (*Id.*, at pp. 1020–1021.) *Coy* itself recognized that face-to-face testimony would not be required when alternate procedures, such as testimony from a remote location, are necessary to further an important government public policy. (*Id.*, at p. 1021; *Craig, supra*, 497 U.S. at pp. 844–845.)

So far, the United States Supreme Court has been called upon to apply *Coy*'s exception in only one case. In *Craig*, the court upheld a Maryland statute that authorized underage victims of child abuse to testify by one-way, closed-circuit TV upon a witness-specific showing that face-to-face testimony would be traumatic to the child.[3] Tracking *Coy*'s exception, the court in *Craig* viewed Maryland's interest in " 'the protection of minor victims of sex crimes from further trauma and embarrassment,' " as not only important, but " 'compelling.' " (*Craig, supra*, 497 U.S. at p. 852.) By requiring a witness-specific showing of trauma, the statute also guaranteed that remote testimony was limited to those situations in which it was necessary to further the state's compelling interest.

Lujan argues that *Craig* marks the outer boundary of when remote testimony is acceptable under the confrontation clause. According to Lujan, allowing children who are not victims to testify remotely transgresses *Craig*'s boundary and is unconstitutional. At no point in the *Craig* opinion, however, did the Supreme Court indicate that it was staking out the perimeter of when the confrontation clause permits remote testimony. *Craig* simply applied *Coy*'s exception to the facts before it. We now do the same. Because this is a question of constitutional law, our review is de novo. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1154 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

The trial court in this case based its use of remote testimony on its earlier finding that Vanessa would be traumatized by facing Lujan in court. This satisfies the necessity component of *Coy*'s exception. Consequently, the constitutionality of Vanessa's remote testimony turns on whether the state has an important public policy interest in protecting minor witnesses who are not victims from the trauma of facing in court the perpetrators of the crimes they witnessed. We conclude that the state has such an interest for three reasons.

First, the court in *Craig* recognized (or, at a minimum, strongly hinted) that the state's compelling interest in protecting child witnesses from trauma reaches *all* child witnesses—not just the subset who are charged as victims. To be sure, *Craig* cited the state's interest in " 'the protection of

---

[3] Because *Craig* approved of a one-way video feed that did not allow the child to see the courtroom at all, there is no merit to Lujan's subsidiary argument that his confrontation rights were violated because Vanessa could see everyone in the courtroom except him over the two-way video feed.

minor victims of sex crimes from further trauma and embarrassment . . . .' " (*Craig, supra,* 497 U.S. at p. 852.) But this was the interest directly implicated by the Maryland statute under review in *Craig*. Significantly, the court stated that this narrower interest was just one aspect of "the State's traditional and ' "transcendent interest in protecting the welfare of children." ' [Citation.]" (*Id.* at p. 855.) This broader interest encompasses *all* child witnesses, victim or not.

Second, there is no principled basis upon which to distinguish the state's interest in protecting child witnesses who are victims from those who are not. The state's long-standing interest in protecting the welfare of children applies just as readily to children, such as Vanessa, who are forced to witness the abuse of their siblings at close range as it does not the actual victims of such abuse.

Third, viewing the state's interest in protecting nonvictim child witnesses as less important is itself constitutionally suspect. Lujan urges us to treat children who are not victims of a crime as *categorically* less traumatized and hence never excused from face-to-face confrontation. Doing so commits the very sin the Supreme Court condemned in *Coy*—that is, making a "generalized finding" about the level of trauma certain groups of witnesses experience when confronting defendants. (*Coy, supra,* 487 U.S. at pp. 1020–1021.) This argument is particularly unpersuasive in this case, where Lujan does not dispute the trial court's finding that Vanessa would be traumatized by confronting him, even though she is not the victim of any charged crime.

 We hold that child witnesses shown to be traumatized by face-to-face confrontation may testify remotely without violating a defendant's confrontation clause rights, whether or not those witnesses are victims of an independent crime committed by that defendant. (Accord, *U.S. v. Etimani* (9th Cir. 2003) 328 F.3d 493, 498–501 [upholding, under *Craig*, the federal child victims and child witness rights rule (18 U.S.C. § 3509(a)(2)), which authorizes the use of remote testimony for nonvictim child witnesses].)

### C. *The Trial Court Had Authority to Order Remote Testimony*

Lujan also argues that, even if his constitutional rights were not violated, the trial court lacked the authority under state law to order remote testimony. Lujan contends that section 1347 already speaks to this subject and limits the use of remote testimony to child victims of certain enumerated offenses. (*Id.,* at subd. (b)(1).) By exceeding this statutory grant of authority, he asserts that the trial court's order permitting Vanessa to testify remotely was invalid.

 Lujan is correct that the trial court's order falls outside the ambit of section 1347, subdivision (b)(1), because Vanessa is not a victim of a sexual

offense, a violent felony or a specified domestic violence offense. But that is not the end of the matter. Trial courts also possess a constitutionally conferred, inherent authority to "create new forms of procedure" in the gaps left unaddressed by statutes and the rules of court. (*James H. v. Superior Court* (1978) 77 Cal.App.3d 169, 175 [143 Cal.Rptr. 398]; see *People v. Avila* (2011) 191 Cal.App.4th 717, 722–723 [119 Cal.Rptr.3d 657]; *Citizens Utilities Co. v. Superior Court* (1963) 59 Cal.2d 805, 812–813 [31 Cal.Rptr. 316, 382 P.2d 356] (*Citizens Utilities Co.*); see also Cal. Const., art. VI, § 1; Code Civ. Proc., § 187 [codifying this power]).

The propriety of Vanessa's remote testimony turns on whether the trial court had the inherent authority to order remote testimony by a nonvictim child witness whom the court found would be traumatized by in-court testimony. We review the existence of this authority de novo. (*Carpenter v. Jack in the Box Corp.* (2007) 151 Cal.App.4th 454, 460 [59 Cal.Rptr.3d 839].) But we review the exercise of inherent authority under the abuse of discretion standard. (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1283 [124 Cal.Rptr.3d 214]).

We are mindful that courts must tread carefully when exercising their inherent authority to fashion new procedures. We may not sanction procedures of dubious constitutional validity. (*In re Amber S.* (1993) 15 Cal.App.4th 1260, 1266 [19 Cal.Rptr.2d 404] (*Amber S.*).) Nor may we bless procedural innovations inconsistent with the will of the Legislature or that usurp the Legislature's role by fundamentally altering criminal procedures. (*Hochheiser v. Superior Court* (1984) 161 Cal.App.3d 777, 791 [208 Cal.Rptr. 273] (*Hochheiser*); see *People v. Collie* (1981) 30 Cal.3d 43, 55–56 [177 Cal.Rptr. 458, 634 P.2d 534] [refusing to create reciprocal discovery procedures], superseded by § 1054.3; *Reynolds v. Superior Court* (1974) 12 Cal.3d 834, 837 [117 Cal.Rptr. 437, 528 P.2d 45] [refusing to create alibi notice requirements], superseded by § 1054.1 et seq.)

These countervailing concerns are not strongly implicated when it comes to remote testimony by nonvictim child witnesses. As explained above, necessity-based remote testimony by child witnesses stands on solid constitutional footing.

■ Authorizing remote testimony in this context also does not contravene our Legislature's intent. To the contrary, the Legislature in section 1347 itself declared its intent "to provide the court with discretion to employ alternative court procedures to protect the rights *of a child witness*, the rights of the defendant, and the integrity of the judicial process." (*Id.*, subd. (a), italics added.) This intent is not limited solely to child witnesses who are victims. (Accord, Evid. Code, § 765, subd. (b) [authorizing court to "take special care

to protect" witnesses under 14 years of age "from undue harassment or embarrassment"].) Accordingly, necessity-based remote testimony by nonvictim child witnesses is consistent with our Legislature's intent, even though it is not specifically authorized by the statute. (Cf. *Rutherford v. Owens Illinois, Inc.* (1997) 16 Cal.4th 953, 967 [67 Cal.Rptr.2d 16, 941 P.2d 1203].)

The trial court required the state to comply with every procedural requirement of section 1347, except the requirement that the child see the defendant. (*Id.*, at subd. (i).) Thus, the court effectively used its inherent authority to extend section 1347 to nonvictim witnesses. This is an incremental extension and does not transmogrify criminal procedure in any fundamental way. In light of these considerations, the propriety of remote testimony by child witnesses is much different today than it was when *Hochheiser* held that a trial court lacked authority to allow a child abuse victim to testify remotely. (*Hochheiser, supra*, 161 Cal.App.3d at pp. 791–792.) Because *Hochheiser* was decided before *Coy, Craig* or section 1347 existed, it is no longer good law.

The soundness of our conclusion is confirmed by the many cases that have upheld a trial court's inherent authority to implement a plethora of alternate procedures for witness testimony. Courts have upheld the use of different in-court seating arrangements for children. (*People v. Sharp* (1994) 29 Cal.App.4th 1772, 1780–1786 [36 Cal.Rptr.2d 117], overruled on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434 [45 Cal.Rptr.2d 905, 903 P.2d 1037].) They have affirmed use of previously videotaped testimony of an adult victim-witness with mental disabilities that was recorded outside the defendant's presence. (*People v. Williams* (2002) 102 Cal.App.4th 995, 1003–1009 [125 Cal.Rptr.2d 884].) They have even sanctioned the use of one-way, closed-circuit TV in juvenile proceedings where section 1347 does not apply. (*Amber S., supra*, 15 Cal.App.4th at pp. 1264–1266; cf. *People v. Murphy* (2003) 107 Cal.App.4th 1150, 1158 [132 Cal.Rptr.2d 688] [not allowing use of one-way remote testimony for child victim-witness because trial court made no showing of necessity].) These cases soundly reject Lujan's further contention that any exercise of a court's inherent authority to extend section 1347 to nonvictim child witnesses is limited to following all of that section's procedural requirements, including the requirement that the child see the defendant. (Accord, *Citizens Utilities Co., supra*, 59 Cal.2d at pp. 812–813 [using inherent authority to craft a different valuation rule for condemnation of public utilities than the rule specified by statute].)

█ We hold that the trial court possessed the inherent authority to permit the use of two-way, closed-circuit TV for a child witness after the necessity for that procedure was demonstrated, even though she was not a victim. In light of this holding, we need not address the State's alternative argument that Vanessa was a "victim," within the meaning of section 1347, subdivision (b), of various uncharged crimes.

Because Lujan does not contest the court's finding of necessity, the court also did not abuse its discretion in ordering the procedure in this case. As this procedure comports with state law, we need not address Lujan's additional argument that the violation of state law also violated his federal due process rights.

[[II.–IV.]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Yegan, Acting P. J., and Perren, J., concurred.

A petition for a rehearing was denied January 15, 2013, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 20, 2013, S208177.

---

*See footnote, *ante*, page 1499.