Filed 9/21/23  Conservatorship of the Person of R.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| Conservatorship of the Person of R.C., | D080473 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. MH116118) |
| v. | |
| R.C., | |
| Defendant and Appellant. | |
| DEPARTMENT OF STATE HOSPITALS, | |
| Respondent, | |

APPEAL from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Dismissed in part as moot, affirmed in part.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown, Jessica Gabriela Acuna and Jackquelyn Y. Young, Deputy Attorneys General for Respondent, Department of State Hospitals.

No appearance by Plaintiff and Respondent.

The trial court, the Honorable Frederick Maguire, found R.C. incompetent to stand trial after he killed two family members. In 2019, the court appointed a public conservator (the conservator) as his conservator under the Lanterman–Petris–Short (LPS) Act (Welf. & Inst. Code, § 5000 et seq.) and determined that a secured state hospital was the most appropriate placement for R.C. In 2021, the trial court set a hearing on an order to show cause (OSC) as to why the California Department of State Hospitals (DSH) should not be held in contempt for failing to comply with the existing court order that R.C. be admitted to a DSH facility. The trial court subsequently ordered DSH to admit R.C. to a DSH facility within 60 days and continued the OSC hearing to address whether this had occurred.

A different judge, the Honorable Marian F. Gaston, presided over the continued hearing, found DSH in violation of the court's order, and sanctioned it $1,000. After another hearing, this judge vacated both the sanctions order and the order requiring that R.C. be admitted to DSH by a certain date. On appeal, R.C. argues the court erred in vacating these orders.

During the pendency of this appeal, R.C. was admitted to a state hospital and we requested supplemental briefing from the parties addressing whether this appeal is now moot and, if so, whether any exception applies that should preclude dismissal of the appeal. Both parties agree that R.C.'s claim for admission to a state hospital is moot and we have the discretion to review R.C.'s claim despite its mootness. The parties similarly concur that

2

the order vacating sanctions is not moot, with the parties disputing whether the order is appealable and R.C. asserting that the only way to evaluate the propriety of sanctions is to address all the underlying issues on their merits.

Ultimately, we do not disagree that seemingly interminable delays in finding appropriate placement for gravely disabled "Murphy" conservatees presents an issue of significant public importance. At the same time, this particular case reflects a complex procedural history involving arguably inconsistent orders by two different judicial officers that, in our view, makes it an inappropriate vehicle for broad pronouncements of general applicability. As a result, we decline to consider the merits of the order that vacated the earlier order requiring R.C. be admitted to DSH by a certain date and dismiss that portion of the appeal as moot. As to the court's order vacating sanctions, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *R.C.'s Conservatorship*

In 2015, R.C. was charged with two counts of murder after he fatally stabbed his grandmother and uncle. He was found incompetent to stand trial and committed to respondent DSH at Patton (DSH-Patton) for competency restoration. He was repeatedly treated, returned to court, and found incompetent again over the course of three years. In January 2019, R.C. was determined to be permanently incompetent, and discharged from DSH-Patton to a jail facility.

In April 2019, the trial court found R.C. was gravely disabled, making him the subject of a "Murphy" conservatorship.[1] The court appointed the

---

[1]  In general, criminal defendants who are mentally incompetent (Pen. Code, § 1367, subd. (a)), are "referred to as incompetent to stand trial or 'IST.' If a defendant is found IST by the court, Penal Code section 1370 provides that criminal proceedings 'shall be suspended until the person becomes

conservator for him and concluded the "least restrictive placement available and necessary to achieve the purpose of treatment" was a state hospital. In May 2020, the conservator submitted a referral to DSH-Metropolitan but R.C. could not be admitted to DSH-Metropolitan based on his murder charge and was re-directed for admission to DSH-Napa. The waitlist for admission of LPS patients to each DSH facility is based on the patient's date of referral by his or her conservator. R.C.'s waitlist position for DSH-Napa is based on his original May 2020, referral date to DSH-Metropolitan. In June 2020 and 2021, the trial court granted the conservator's petitions to extend the conservatorship, again determining that a state hospital was the least restrictive placement. (§ 5008, subd. (h)(1)(B).)

B. *The Court's Frustration*

At a hearing on July 8, 2021, over two years after establishment of R.C.'s conservatorship, Judge Maguire noted R.C. had not yet been transported to DSH and "what has happened here is just totally unacceptable." Present at this hearing was defense counsel and county counsel. Without giving DSH notice or an opportunity to be heard, the court "ordered that [R.C.] be released to the State Hospital; that the State Hospital accept him within 45 days of today. I'm going to set a hearing date in the week before the 45 days, set a hearing date to see what the status is from the State Hospital and to entertain and to explore all—give Counsel an

---

mentally competent.' (Pen. Code, § 1370, subd. (a)(1)(B).)" (*People v. Edwards* (2023) 88 Cal.App.5th 1259, 1263.) A "Murphy" conservatorship applies to that narrow category of IST defendants who are charged with "a felony involving death, great bodily harm, or a serious threat to the physical well-being of another, and who do not have the prospect of a restoration of competency." (*Conservatorship of Christopher B.* (2015) 240 Cal.App.4th 809, 811; see Welf. & Inst. Code, § 5008, subd. (h)(1)(B)(i).) It provides for a renewable one year civil commitment. (*Conservatorship of Christopher B.*, at p. 811.)

4

opportunity to give the Court an explanation of the remedies that they seek." The court asked the conservator to find a locked treatment facility for R.C. pending his transfer to DSH and set a hearing "for us to determine what my authority is to force [DSH] to come get him."

At the next hearing on August 19, 2021, county counsel informed the court that R.C. had been rejected for placement by several in county locked facilities and was currently being reviewed by two other locked facilities. Defense counsel renewed her request to have R.C. immediately released from jail to a treatment facility and requested the court set an OSC that DSH accept R.C. The court deferred on the requested OSC to get a status from DSH and the two locked facilities where R.C. was under review. Defense counsel argued a violation of R.C.'s due process and equal protection rights, with the trial court agreeing: "I couldn't agree with you more. Okay? But whether there are due process violations will be for someone else to make a determination on because we've—I've heard these arguments already." There was no mention of filing a petition for writ of habeas corpus allowing DSH to appear and respond to these allegations of constitutional violations, and for the trial court to formally rule on them.

C. *Order to Show Cause and Additional Briefing*

On October 14, 2021, Judge Maguire set an OSC hearing as to why DSH should not be held in contempt for failing to comply with the existing court order that R.C. be admitted to a DSH facility. DSH made its first appearance on November 8 when it filed its response to the OSC arguing, among other things, that the OSC was procedurally defective.

At a hearing two days later, the court requested further briefing whether it: (1) may order DSH to accept an individual under Murphy conservatorship; (2) has the authority to issue a particular timeline for DSH

5

to accept each individual; (3) should order placement into a less restrictive level of placement if there are no beds available; and (4) should order sanctions for noncompliance with those court orders if they are lawful. R.C. filed his response on November 29, and DSH filed its reply on December 6.

DSH's December 6 briefing included declarations from Jennie Clay, the clinical administrator at DSH-Napa, Michael Reyes, a nursing coordinator at DSH-Metropolitan, and Trey Stoddard, a DSH staff services manager. Clay stated that LPS/Murphy conservatees are referred by the county's public guardian to a specific facility, each facility has its own waitlist, all conservatees are placed on the waitlist in accordance to their date of referral, and no beds are reserved for specific counties. She indicated that conservatees remain on the waitlist until an LPS patient is discharged to a less restrictive placement in the community, thereby opening a bed. DSH-Napa "has 23 LPS patients who are clinically ready to be discharged to a less restrictive environment. However, the conservators, most County Public Guardians, for these patients have failed to place them in the community which further exacerbates the wait time for admissions of LPS patients from the waitlist."

Clay indicated that "[t]he permissible ratio of patient to DSH staffing, for licensing purposes, is governed by Intermediate Care Facilities (ICF) regulations. ICF regulations establish a certain standard of care for mentally disordered or developmentally disabled patients being cared for by nurses and psychiatric technicians. (22 CCR § 73319 (e)(l)(A-B).) Additionally, bargaining unit contracts state we will staff at a minimum 1:8 ratio (one staff member per eight patients). Depending on the unit, population, and their needs, DSH-N[apa] may staff at a higher ratio such as 1:7 or 1:6, but 1:8 is the minimum permissible ratio." She also indicated that DSH-Napa had to

6

change its admission procedures in response to the COVID-19 pandemic to mitigate COVID-19 exposure, transmission, and infection, thus causing delays in admissions due to outbreaks and quarantines within jails and DSH facilities.

Stoddard stated that the California Mental Health Services Authority (CalMHSA), a joint powers authority of counties and cities with mental health programs, represents the counties and cities in negotiating the number of beds DSH will provide for LPS patients as prescribed in Welfare and Institutions Code section 4331. Under the current Purchase of State Hospital Beds Memorandum of Understanding (Purchase MOU), CalMHSA negotiated at total of 556 statewide intensive treatment beds for LPS and other conservatee commitments to DSH.[2]

DSH noted that the Governor's COVID-19 emergency orders resulted in all LPS admissions and discharges being suspended for 90 days. DSH argued

_____

[2]    Each year, every county must contract with DSH "for the number and types of state hospital beds that the department will make available to the county or counties during the fiscal year." (Welf. & Inst. Code, § 4331, subd. (a).) "There shall be no increase in the number of beds provided to a county or group of counties during a fiscal year unless the contract between the State Department of Mental Health, or its successor, the State Department of State Hospitals, and that county or group of counties is amended by mutual agreement. Any significant change in services requested by a county shall require amendment of the contract." (*Id.* at subd. (c).)

The Purchase MOU is the contract between DSH and San Diego County for "Fiscal Year 2014-15 through Fiscal Year 2015-16." Under the Purchase MOU, DSH is required to provide 556 statewide beds for LPS conservatees. The Purchase MOU was extended and terminated on June 30, 2020. DSH is in the process of updating this agreement. In the meantime, San Diego County is following the terms of the Purchase MOU. As of March 21, 2022, DSH's census reflected a total of 736 LPS conservatees currently housed at DSH facilities. This accounts for 180 more beds than required under the Purchase MOU. The Purchase MOU provides that denial of admission may be based on "the Hospital's lack of bed capacity."

7

that the OSC should be discharged and sanctions denied because it is merely a treatment facility and has no power to discharge conservatee patients that are ready to be transferred and admit new conservatee patients. DSH claimed "[i]t is unreasonable to expect that DSH could recover from an already overburdened pre-pandemic waitlist, and a 90-day suspension backlog, in such a short period of time. This completely ignores the ongoing pandemic challenges to admissions and the failure of the conservators to transfer out patients who are ready to be moved to less restrictive settings."

D. *Order Requiring DSH Admit R.C*

At the December 8, 2021 OSC hearing, DSH argued it was "a treatment provider" and R.C.'s long period in jail needed to be "handled in a writ for habeas corpus if necessary." Judge Maguire acknowledged that the statutes governing Murphy conservatorships did not require DSH admission " 'within a reasonable time period,' but I'm—I'm satisfied. It's got to be within a reasonable timeframe. That's why we're here to see if there is a justification or not." The court agreed with DSH that no order existed which required DSH admit R.C. to one of its facilities  The judge indicated he would issue an order "so that you can writ me or take an appeal if you think I'm wrong, because I think we're in uncharted territory here. But everybody wants to get—at least, from my perspective, I see everybody wants to get [R.C.] to where he needs to be." Judge Maguire subsequently issued an order for DSH to admit R.C. to a state hospital within 60 days, stating, "I know it's not going to happen, but we will deal with that at a later date." The court continued the OSC hearing to March 2, 2022, to address whether DSH had admitted R.C. by February 7.

E. *A New Judge Attempts to Enforce the Admission Order*

For reasons not apparent from the record, Judge Maguire did not preside over the March 2, 2022, hearing.[3] He was replaced by Judge Gaston. Because she was not the prior judicial officer and before hearing argument, Judge Gaston reviewed the facts with the parties. All parties agreed that Judge Maguire had ordered R.C. be placed in DSH by February 7 and had ordered all parties back on March 2.

Counsel for DSH stated it provided briefing to the court in December 2021 and briefly reiterated what was in that briefing. Judge Gaston acknowledged "those arguments were made in December." She found DSH in violation of the Judge Maguire's December 8, 2021, order and imposed sanctions of $1,000. She further ordered DSH to receive R.C. and set the matter for a status conference and an additional OSC in the event "he's not been received [by DSH]." Judge Gaston also requested information from the conservator regarding R.C.'s updated risk assessment and his required level of care. The conservator submitted an evaluation report prepared by a San Diego County Psychiatric Hospital staff psychiatrist recommending R.C. be transferred to the San Diego County Psychiatric Hospital.

On March 15, 2022, DSH filed a motion for an evidentiary hearing and requested a stay of the trial court's March 2 sanctions order, arguing that Code of Civil Procedure[4] section 177.5 affords parties the opportunity to be heard before sanctions are imposed. Judge Gaston granted DSH's motion,

---

[3]   The reporter's transcript for the March 2, 2022, hearing lists the Honorable Maureen F. Hallahan as the judge. We are assuming this is a mistake because the parties represent that Judge Gaston presided over this and all subsequent hearings and Judge Hallahan's name does not appear anywhere else in the record.

[4]   Undesignated statutory references are to the Code of Civil Procedure.

stayed sanctions, and continued the OSC to allow DSH "the opportunity to make the record that they want to make."

F. *The Subject of the Appeal: the April 20, 2022 Orders*

On April 8, 2022, DSH filed briefing, declarations, and exhibits in response to the trial court's OSC explaining that the OSC should be discharged and sanctions denied because it was abiding by its statutory and contractual obligations. Specifically, DSH argued: (1) it is not obligated to admit more LPS patients than contractually negotiated or statutorily mandated; (2) the court order requiring a 60-day admission violates the separation of powers doctrine; (3) the conservator is responsible for finding appropriate treatment for R.C.; (4) Murphy conservatees are not similarly situated as IST defendants for purposes of DSH hospital admissions; and (5) multiple factors beyond DSH's control have caused further delays to LPS patient admission. DSH also pointed out "to the extent that the requesting party argues that the conservatee's due process rights have been violated, the appropriate avenue to address that issue is through a writ of habeas corpus and not through an order to show cause."

Clay, the clinical administrator for DSH-Napa since 2018, has been at that location since 2007. She stated, "During my tenure at DSH, I have not seen any cases where a court ordered DSH to admit a conservatee within a specific period of time, without regard to the other conservatees on the waitlist. This would be a grave mistake that would have ripple effects across the LPS/Murphy waitlist as other counties would likely follow suit and it would inherently prejudice the conservatees who have been waiting longer for admission." She indicated there is a waitlist for DSH admissions of LPS conservatees and admissions are made on a first-come-first-served basis based on the referral date. DSH facility has its own LPS waitlist and the

10

LPS/Murphy waitlist is separate from the waitlist for other forensic patients as individuals who are IST. For an LPS bed to become available, another LPS conservatee must be discharged. "When an LPS patient is ready for discharge, DSH-N[apa] reaches out to the conservator, often the public guardian, to advise them. If placement is available, DSH immediately sends over the placement packet and other necessary documentation to effectuate the patient's transfer. However, most LPS patients are waitlisted at a new facility. Too often, these LPS patients wait so long that they grow frustrated and begin to decompensate which further prolongs their transfer. DSH repeatedly reminds the conservators of their conservatee's status when they are ready for discharge but have not been transferred."

As of April 2022, DSH-Napa had 34 LPS patients who were clinically ready to be discharged to a less-restrictive environment. "However, the conservators, mostly county public guardians, for these patients have failed to place them in the community which further exacerbates the wait time for LPS admissions." The COVID-19 pandemic also negatively impacted the waitlist.

At the April 20 hearing, Judge Gaston listed the documents she reviewed, including DSH's December 6, 2021, briefing and declarations, and the four documents submitted on April 8, 2022. She explained that she *did not* review DSH's December 6, 2021, briefing and declarations submitted for the March 2, 2022, OSC hearing prior to issuing her order that DSH was required to receive R.C. Judge Gaston stated: "Frankly, at our [March 2, 2022,] hearing, I didn't know what [DSH was] talking about because I didn't have . . . your documents, which are very thorough." When the judge asked all parties whether they agreed on the facts set forth in their briefing and declarations and whether they wanted to provide further argument on the

legal issues, counsel for R.C., DSH, and San Diego County all submitted. Judge Gaston then vacated her previous order that R.C. be placed in the state hospital by a date certain as not supported by statute or the constitution. She also vacated her order sanctioning DSH.[5]

On April 25, 2022, the parties stipulated to extend R.C.'s conservatorship for another year. His present diagnosis is schizophrenia and stimulant use disorder. R.C. appeals from Judge Gaston's orders vacating sanctions and the order requiring R.C. be admitted to DSH by a certain date. During the pendency of this appeal, R.C. was admitted to DSH.

DISCUSSION

A. *The Challenge to the Order Requiring DSH Admission Is Moot*

"A case is considered moot when 'the question addressed was at one time a live issue in the case,' but has been deprived of life 'because of events occurring after the judicial process was initiated.' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574.) "The pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any effectual relief." (*Ibid.*) The parties agree the order requiring DSH admit R.C. to a DSH facility is moot because R.C. is now in a DSH facility and we cannot grant R.C. any effective relief. Nonetheless, we have discretion to decide moot issues "if a pending case poses an issue of broad public interest that is likely to recur . . . ." (*In re William M.* (1970) 3 Cal.3d 16, 23.)

On the record before us, we decline to exercise our discretion to reach the merits of this appeal. At the outset we note that after the court found

_____

[5] After the court made its orders, R.C.'s counsel advised that R.C. had been transferred to the San Diego County Psychiatric Hospital, where he was currently residing.

12

R.C. permanently incompetent, the public conservator inexplicably waited over one year to submit a referral to DSH. We have no information as to why this occurred and whether it is a one-time occurrence or a habitual problem that is likely to recur. This one year delay significantly affected R.C.'s placement on the waiting list for admission to a DSH facility because DSH admission is based on the individual's referral date and each facility has its own waitlist. Additionally, DSH is one facility in a list of facilities. (Welf. & Inst. Code, § 5358, subd. (a)(2).) Based on the delay in getting R.C. referred to DSH, his conservator could have asked the trial court to change the placement to a "Closed (locked) Treatment Facility" even on a temporary basis until a DSH facility had an opening. The trial court even suggested this at the July 8, 2021, hearing.

Second, the global COVID-19 pandemic created unique challenges because the Governor's COVID-19 emergency orders resulted in all LPS admissions and discharges being suspended for 90 days. The pandemic also required DSH to change its admission procedures to mitigate COVID-19 exposure, transmission, and infection, thus causing delays in admissions due to outbreaks and quarantines within jails and DSH facilities.

Finally, the procedural posture of this case is unusual and concerning. In July 2021, Judge Maguire found the failure to admit R.C. to a DSH facility to be "totally unacceptable." Without giving DSH notice or an opportunity to be heard, the court ordered DSH to accept R.C. within 45 days and set a hearing to determine R.C.'s status and have counsel address possible remedies. At the next hearing in August 2021, defense counsel noted that R.C. had been rejected by several in county locked facilities and requested the court set an OSC that DSH accept R.C. The court agreed with defense counsel that the delay violated R.C.'s due process and equal protection rights

13

but never suggested that defense counsel file a writ of habeas corpus which would have allowed DSH to appear and address these alleged constitutional violations, and for the trial court to formally rule on them.

In October 2021, the trial court issued an OSC, giving DSH the ability to appear and respond. At the subsequent hearing in December 2021, counsel for DSH argued that it was "a treatment provider" and R.C.'s long period in jail needed to be "handled in a writ for habeas corpus if necessary." The court disregarded this suggestion and ordered DSH to admit R.C. to a DSH facility within 60 days. At a hearing in November 2021, the court requested further briefing, which DSH filed on December 6. At the hearing two days later, the trial court ordered DSH to admit R.C. to a DSH facility within 60 days and continued the OSC hearing to determine whether this had occurred.

Judge Gaston presided over the continued hearing on March 2, 2022, finding DSH in violation of the court's order and imposing sanctions of $1,000. She ordered DSH to receive R.C. and set the matter for a status conference and an additional OSC in the event "he's not been received [by DSH]." But two weeks later she granted DSH's request for an evidentiary hearing. Following that hearing, the judge vacated both the sanctions order and the order requiring R.C. be admitted to DSH by a certain date. In doing so, she explained that she did not review DSH's December 6, 2021, briefing and declarations submitted for the March 2, 2022, OSC hearing prior to issuing her order that DSH was required to receive R.C.

This complicated and somewhat confused procedural history shows that no petition for writ of habeas corpus was ever filed to challenge the basis for R.C.'s continued confinement in jail. Instead, the issue evolved over a long period until the trial court's frustration led it to issue an OSC directed to

14

DSH. Had a habeas petition been filed, we would have a fully developed record addressing R.C.'s due process and equal protection challenges.

At the December 8, 2021, hearing Judge Maguire ordered DSH to admit R.C. to a DSH facility within 60 days even though he knew "it's not going to happen." The court heard from the parties but never expressly articulated on what statutory or constitutional basis it was issuing the 60-day admission order to DSH. Rather, it appeared simply to determine that the delay was unreasonable. Counsel for DSH later asked the court to "make a record as to what authority it's making the order on DSH." The trial court responded, but deflected the question regarding its authority:

> "THE COURT: They're ordered to a state hospital, right? And this is the only state hospital, isn't it? That will accept them—accept them by contract.
>
> "MS. ACUNA: I mean, specifically to the time limit of 60 days.
>
> "THE COURT: I think it's a reasonable time given the time that's already elapsed. I mean, it would be close to two years, three years for him, but I can't blame the state hospital for one year. And so, that's the justification, in its entirety—from the point of referral, which should not have been that late, to the point of today or 60 days from today— kind of gives everybody enough notice. And I think two years—frankly, I think one year is an unreasonable time."

In light of all these circumstances, we cannot conclude that this case, particularly given its unusual procedural context, presents an "issue of broad public interest that is likely to recur . . . ." (*In re William M.*, *supra*, 3 Cal.3d at p. 23.) Accordingly, we decline to exercise our discretion to address R.C.'s admittedly moot claim.

15

II. *Vacation of the Sanctions Order*[6]

R.C. contends Judge Gaston properly imposed sanctions on DSH for its failure to comply with Judge Maguire's initial 60-day admission order. He asserts that Judge Gaston improperly reconsidered and revoked the sanctions order under section 1008, requesting that we reimpose them. DSH responds that Judge Gaston had the inherent authority to reconsider the sanctions on her own motion. We agree with DSH, particularly given the due process notice issues it raises.

Subdivision (c) of section 1008 allows a court to reconsider a prior order on its own motion based on a "change of law." There was no change in law between the time Judge Gaston issued the sanctions order and then vacated the order. Nonetheless, "[e]ven without a change of law, a trial court may exercise its inherent jurisdiction to reconsider an interim ruling." (*Pinela v. Neiman Marcus Group, Inc.* (2015) 238 Cal.App.4th 227, 237.) This authority exists to allow trial courts to correct their own errors. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1107.) We review a trial court's exercise of its inherent authority for an abuse of discretion and, on this record, see no abuse of discretion in the court's reconsideration of its sanction order. (See *People v. Lujan* (2012) 211 Cal.App.4th 1499, 1507.)

On the merits of Judge Gaston's decision to vacate her prior sanctions order, we disagree with R.C.'s contention that we must address all the substantive issues in this appeal to determine whether the sanctions order

---

6    We disagree with DSH's argument that the order vacating sanctions is an interlocutory order that is not immediately appealable pursuant to section 904.1, subdivisions (a)(11) and (a)(12) because it does not exceed $5,000, and the trial court has not entered final judgment. The order vacating sanctions is an order after judgment that is appealable under section 904.1, subdivision (a)(2).

was properly vacated. An order imposing sanctions pursuant to section 177.5 is reviewed generally for abuse of discretion (*Caldwell v. Samuels Jewelers* (1990) 222 Cal.App.3d 970, 977); we similarly employ the abuse of discretion standard in reviewing an order vacating a prior sanction order. Although this standard is highly deferential, "an abuse of discretion will be found on appeal if a sanctions order . . . violates due process, [a] matter[ ] we decide exercising our independent review." (*People v. Landers* (2019) 31 Cal.App.5th 288, 304 (*Landers*).)

" 'Due process, as well as the statute itself, requires that a person against whom Code of Civil Procedure section 177.5 sanctions may be imposed be given adequate notice that such sanctions are being considered, notice as to what act or omission of the individual is the basis for the proposed sanctions, and an objective hearing at which the person is permitted to address the lawfulness of the order, the existence of the violation, and the absence of good cause or substantial justification for the violation.' " (*People v. Hundal* (2008) 168 Cal.App.4th 965, 970 (*Hundal*).) The same requirements of notice and an objective hearing must be met when the trial court raises the issue of sanctions on its own motion. (*Barrientos v. City of Los Angeles* (1994) 30 Cal.App.4th 63, 70 (*Barrientos*).) Such notice must be given before the trial court makes the decision to impose sanctions. (*Ibid.*)[7]

Here, Judge Gaston never provided DSH notice that she was considering awarding sanctions on her own motion. At the November 2021 OSC hearing, Judge Maguire asked the parties to brief available sanctions

---

7    Section 177.5 provides in relevant part, "Sanctions pursuant to this section shall not be imposed except on notice contained in a party's moving or responding papers; or on the court's own motion, after notice and opportunity to be heard. An order imposing sanctions shall be in writing and shall recite in detail the conduct or circumstances justifying the order."

for noncompliance with lawful court orders. DSH did, complaining it "was never served with moving papers and remains unaware of the identity of the moving party. It is unclear whether the court initiated the Order to Show Cause on its own motion."

At the December 2021 hearing, counsel for DSH argued it could not be sanctioned because it was not in violation of a prior court order. Judge Maguire acknowledged no order existed that required DSH admit R.C. to one of its facilities; accordingly, he issued one requiring that DSH admit R.C. within 60 days. Then, at the March 2, 2022, hearing, Judge Gaston sanctioned DSH on the court's own motion without notice it would be doing so or providing DSH an opportunity to be heard. The judge simply found she had the authority to sanction DSH, found DSH to be in violation of a prior order, and sanctioned it $1,000. Although very understandable given the abrupt change in judicial officers, Judge Gaston's failure to afford DSH notice and an opportunity to be heard before imposing sanctions constituted legal error requiring vacation of the sanctions order. (*Landers*, *supra*, 31 Cal.App.5th at p. 304.) Had Judge Gaston not vacated her sanctions order, we would have reversed such a ruling based on this due process violation. Thus, we cannot conclude the judge abused her discretion when she vacated the sanction order. (See *Barrientos*, *supra*, 30 Cal.App.4th at p. 72 [trial court's imposition of monetary sanctions without prior notice or opportunity to be heard and for improper purpose was abuse of discretion].) For this reason, the order vacating sanctions is affirmed.[8]

---

[8] R.C. filed a motion to augment the record with the reporter's transcripts of hearings between January 25, 2022 and March 1, 2022, and on March 10, 2022, in three matters that may have been heard with his case. We deferred this request for consideration with the merits of his appeal.

DISPOSITION

The appeal of the April 8, 2022, order requiring that R.C. be placed in a state hospital by a date certain is dismissed as moot.  The April 8, 2022, order vacating sanctions is affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.

---

Based on our resolution of this appeal, these reporter's transcripts are not relevant and the request to augment is denied.