Filed 3/30/26  P. v. Medrano CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>HUGO QUEZADA MEDRANO,<br><br>　　Defendant and Appellant. | A167598<br><br>(Contra Costa County<br>Super. Ct. No. 02003337193) |

Defendant Hugo Quezada Medrano appeals from his convictions on 30 counts of sex crimes a jury found he committed over a period of several years against his daughters, Jane Doe 1 and Jane Doe 2, as well as from convictions on two lesser included counts of simple battery against Doe 1.  All of the crimes occurred when the girls were children.

Medrano argues we must reverse the judgment in its entirety on two principal grounds.  He contends, first, that the court violated his due process rights by denying him the opportunity to present a complete defense and, second, that the court deprived him of the right to confront adverse witnesses.  Both arguments are based on the court's denial of his motion in limine seeking to present video testimony from his mother as a rebuttal to the girls' account of the circumstances of the offenses.  He also contends three of his convictions were not supported by substantial evidence, and that one of

1

his sentences, a 180-day sentence for count 7, should have been stayed under Penal Code section 654.[1]

The People confess error as to the count 7 sentencing claim and we accept the confession. Except for that issue, we see no merit in any of Medrano's claims. Medrano's proffer of what his mother would have testified defeats his due process and confrontation arguments. Even as he describes it, the proposed testimony was tangential to and cumulative of other evidence and was not particularly reliable. As to his evidentiary sufficiency arguments, he, in effect, asks that we reweigh the proof; our inquiry here begins and ends with a conclusion that the People presented substantial evidence in support of the convictions. Accordingly, we will affirm the judgment, except that we will order a stay of the sentence for count 7.

## I. BACKGROUND

In a January 2023 fourth amended information, the Contra Costa County District Attorney charged Medrano with 32 criminal counts, accompanied by numerous allegations, for alleged sex crimes he committed

---

[1] Undesignated statutory references are to the Penal Code.

against his daughters—eight counts regarding Jane Doe 1[2] and 24 counts regarding Jane Doe 2.[3]

A trial began in December of 2022, when Doe 1 and Doe 2 were 19 and 18 years old respectively. The strength of the evidence overall and the timeline of events is important to Medrano's appeal, so we will detail those matters.

Evidence was presented that Medrano, about 50 years old at the time of trial, returned to Richmond, California after an absence of a few years to care as a single parent for Does 1 and 2. The prosecution, relying largely on the girls' trial testimony and their 2020 Children's Interview Center (CIC) interviews, contended he sexually assaulted them at different times between

---

[2] Regarding Jane Doe 1, Medrano was charged with one count of aggravated sexual assault (rape) of a child under 14 years of age (§ 269, subd. (a)(1); count 1); two counts of forcible rape of a child 14 years of age or older (§ 261, subd. (a)(2); counts 5–6); one count of aggravated sexual assault (sodomy) of a child under 14 years of age (§ 269, subd. (a)(3); count 2); one count of sodomy by use of force of a minor 14 years of age or older (§ 286, subd. (c)(2)(C); count 7); two counts of forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1); counts 3–4); and one count of sexual penetration by foreign object of a minor 14 years of age or older (§ 289, subd. (a)(1)(C); count 8).

[3] Regarding Jane Doe 2, Medrano was charged with three counts of aggravated sexual assault (rape) of a child under 14 years of age (§ 269, subd. (a)(1); counts 9, 10, 11); ten counts of forcible rape of a child 14 years of age or older (§ 261, subd. (a)(2); counts 19–28); one count each of aggravated sexual assault (oral copulation) of a child under 14 years of age (§ 269, subd. (a)(4); count 12), aggravated sexual assault (sodomy) of a child under 14 years of age (§ 269, subd. (a)(3); count 13), sodomy by use of force of a minor 14 years of age or older (§ 286, subd. (c)(2)(C); count 31), and forcible oral copulation of a child over the age of 14 (§ 287, subd. (c)(2)(C); count 30); five counts of forcible lewd act upon a child under 14 years of age (§ 288, subd. (b)(1); counts 14–18); and two counts of sexual penetration by foreign object upon a minor 14 years of age or older (§ 289, subd. (a)(1)(C); counts 29 and 32).

2016 and 2020, starting when the girls were 13 and 12 years old respectively. The prosecution alleged his assaults began when Medrano, upon his return, stayed briefly in an apartment with the girls, his mother, and others. Medrano denied these allegations, contending the girls were making up their accusations in reaction to his disciplinarian ways.

After a couple of months' stay together at the apartment, Medrano, Doe 1, and Doe 2 moved to a house of their own (the Campbell house), and then to another house (the Flemming house).[4] They were joined, starting in the first house in mid-2018, by Medrano's new wife, Adriana, and her sister, Fernanda, and later, by Adriana's and Medrano's new baby, Angel.

## A. *Doe 1's Trial Testimony*

Doe 1 testified at trial that she was born in November 2003. When she was five years old, she moved from Mexico to Richmond, California, where she lived in an apartment with her grandmother, Christina Quezada, Medrano, Doe 2, and other relatives. A couple of months later, probably, after his return from an extended absence, Medrano, Doe 1, and Doe 2 moved to their first house, where each of them had their own bedroom. Doe 1 was best friends with Doe 2, and they were always together.

A few weeks after they moved to their first house, Medrano began coming to Doe 1's bedroom at night while she was awake, lying in her bed, and, for a couple of minutes, touching her under her clothing on her stomach, breast and leg, as well as the inside of her vagina. Then he would kiss her, maybe say goodnight, and leave. He did this every night. Once, in his bedroom, he pulled down her pants and put his penis inside her butt and her

---

[4] Based on the overall evidence presented, it appears Doe 1 mistakenly confused the names of these houses in her testimony. To be consistent in our summary of the witness testimony, we will refer to the houses as the first (Campbell) and second (Flemming) houses rather than by their street names.

4

vagina. She was not sure what time of year this occurred but, she testified, "I had my own room at the time."

Doe 1 shared her bedroom with Fernanda after she and Adriana moved into this first house. Medrano did not come to her room and touch her when Fernanda was there, but he did when Fernanda and Adriana visited family out of town, which happened at least two times.

At the first house, Doe 1 told Fernanda that Medrano "would go to [Doe 2's] room and then my room and he would touch us and everything . . . ." She told Fernanda not to say anything because she did not know what would happen if Medrano was gone, since both Adriana and Fernanda were not working.

When the family moved to their second house, Doe 1 continued to share a bedroom with Fernanda. Medrano did not touch her inappropriately in that house. He would punish Doe 1 for poor grades by taking her phone away for a time, and also would take it every night.

In 2019, social workers came to talk with her, Medrano, and Doe 2 at the first house. She did not tell them what Medrano had done to her. Instead, she said, "I don't know," as he instructed.

Subsequently, at the second house, Doe 1, intending to sneak up on Doe 2 and scare her, peeked into Doe 2's room and saw Medrano sitting by Doe 2, who was lying on her bed, with his hand under her blanket. Doe 2 looked like she wanted to cry. Doe 1 told Fernanda what she had seen and Fernanda said they had to say something, but Doe 1 said no for fear of what would happen. Doe 1 went to her sister and hugged her as she cried and fell asleep.

Doe 1 understood from Fernanda that Adriana called the police. In December 2020, Doe 1, then 17 years old, was interviewed at the Children's Interview Center (CIC).

5

## B. *Doe 1's CIC Interview*

In her December 2020 CIC interview, Doe 1 said that Medrano used to "touch" her, but she could not remember when it started. She recalled that he came to her room a couple of times to say good night, laid down next to her, and began touching her. After they moved out of her grandmother's apartment to a house, when, she was pretty sure, she was a freshman in high school, Medrano started to touch her chest and stomach under her clothes. He put his fingers inside her vagina and moved them more than five times; later in the interview, she only remembered him putting his fingers inside her vagina once, when she was still a freshman.

Medrano's touching Doe 1's chest and stomach was an "every day thing" at their first house, but he did not do anything inappropriate to her at the second house.

Once at their first house, when she was "a freshman still," Doe 1 was in Medrano's room watching television with him when he put his penis in her vagina and her butt. He put his penis in her vagina two or three times, on separate occasions, when she was still a freshman.

The previous year, social workers came to their first house after Doe 2 said something in school, and Medrano looked "kinda scared." Medrano told her and Doe 2 not to say anything. Doe 2 told the social workers "she was just kidding" and "it wasn't true."

At one point, Doe 1 and Doe 2 told each other about what Medrano was doing to them. Doe 2 was the first person Doe 1 told.

About three months before the interview, Doe 1 confronted Medrano about his touching Doe 2 after Doe 2 came to her crying about something he had just done. Medrano said he was sorry and would not do it again.

A month or two before the interview, Doe 1 tip-toed to Doe 2's room to scare her and Medrano. She saw Doe 2 lying in bed and Medrano kneeling

6

with his hand under her blanket.  Medrano and Doe 2 both looked at Doe 1;
Medrano looked scared and took his hand "off," and Doe 2 looked like she
wanted to cry.  Doe 1 went to Fernanda and told her what she had seen.
That same day, Doe 2 told Doe 1 that Medrano had been "touching" her,
continuing even after she cried and told him to stop.

Doe 1 decided to tell what Medrano had done because Doe 2 was
"always sad," always in her room, and did not clean or anything.

### C. *Doe 2's Trial Testimony*

Doe 2 testified that she was born in October 2004.  Medrano first
sexually assaulted her the night he returned from Mexico to the Richmond
apartment as he laid next to her in the bottom bed of a three-level bunkbed.
Her grandmother, whom Doe 2 assumed was sleeping, was in the bed directly
above them and Doe 1 was in the bed above the grandmother's.  Medrano
pulled down Doe 2's pants and inserted his penis into her vagina, which hurt
her, and "kept going" until he "stopped," then said he was sorry and went to
sleep.

A few months later, when she was 12 years old, Doe 2, Medrano, and
Doe 1 moved to their first house, which had three bedrooms.  Not long after,
Medrano began sexually assaulting Doe 2 on a daily basis, sometimes in her
room and sometimes in his.  He touched her breasts, stomach, legs, vagina,
and butt with his hands, both over and under her clothing.  He also put his
fingers in her vagina.  Sometimes he said he was sorry.

One time, maybe on their first day in this first house, Medrano, Doe 2,
and Doe 1 were lying in bed together.  Medrano touched Doe 2's breasts,
vagina, and buttocks under her clothes for a few minutes, then turned around
and, Doe 2 assumed, touched Doe 1 inappropriately as well.  She talked to
Doe 1 within days of the incident, and each acknowledged that Medrano was

7

touching her. They didn't do anything because they did not know what they were supposed to do.

A few weeks, probably, after they moved to this first house, Medrano called Doe 2 to his room, took her clothes off, put his hands all over her body, and put his penis into her vagina for a second time. After that, Medrano, touched her with his hands and put his penis in her vagina "[a]lmost daily"; after Adriana moved in he did it maybe every other night and after Angel was born he did it a little less than that. He also put his mouth on Doe 2's chest, stomach, all of her vagina, and legs, probably almost as many times as he penetrated her. One time, probably a few weeks or months after they moved into the first house, he put a "toy" into her vagina. He usually assaulted her at night when they were alone, in his room, in her room, or sometimes in the living room. He told her, "This is sex," and told her not to tell anyone.

Doe 2 once told Medrano to stop. He did for a week or two, but then started again. She was in the eighth grade at the time and told a friend, Vanessa F., that she had lost her virginity to her father.

Starting a month or two after they moved into their first house, Doe 2 would maybe once a week ask Doe 1, with whom she was very close, to sleep in her room. When Doe 1 did, Medrano would pause his assaults on Doe 2, but he would tell Doe 1 to return to her room after a couple of nights and start again.

Relatives stayed with them for some months in the first house, occupying Doe 1's room. During this time, Doe 2 likely shared a bedroom with Doe 1. Medrano continued to abuse her on a daily or nearly daily basis.

Once, probably a few months after they moved to this first house, Medrano put his fingers in Doe 2's vagina when Doe 1 was in Doe 2's room,

8

without Doe 1 knowing about it. He also did this a few times in their living room with Doe 1 present, both before and after Adriana and Fernanda moved in, which was about a year after Medrano, Doe 1, and Doe 2 began living in this house. When Doe 1 went to sleep, Medrano put his penis in Doe 2's vagina.

Social workers came to talk with them in 2019 at the first house, after Doe 2 accidentally indicated in a school report that she had been sexually abused. To protect Medrano, she told the social workers a made-up story about being abused by a family friend. She was not sure she wanted Medrano to go to jail, did not know at the time what was specifically wrong and specifically right, and knew if she spoke that he would not be there anymore.

Later, they all moved to the second house, which also had three bedrooms. Medrano continued to sexually assault Doe 2 as before, including penetrating her. He also put his penis on her mouth, touching her teeth and lips before she pushed him away, and touched her butthole with his penis, which caused her to feel "a little sting" that "hurt really bad" before she moved away.

Medrano also penetrated Doe 2 a couple of times during their summer visits to an aunt's house in Los Angeles and once in a hotel room in Indio, California.

Over the five years that Medrano sexually assaulted Doe 2, he stopped a few times for a week or so, either because he said he would stop or because he was mad at her. He would get mad because the girls were using Snapchat or Instagram or because of boys, and took their phones away. When they lived in the first house, he hit her "really bad one time" after finding she had said something inappropriate on her phone to a boy.

9

In late November 2020, Medrano took the girls' phones away and returned Doe 2's on the day he was arrested. She was annoyed that he monitored her phone and thought he was overprotective, but she did not really get upset about it. He also threatened a couple of times to send the girls back to Mexico.

At the time of trial, Doe 2 was applying for a special immigrant status that she had learned about the previous August, citing Medrano's abuse of her as one reason for her application. If granted, she would have lawful permanent resident status.

### D. *Doe 2's CIC Interview*

In her December 2020 CIC interview, Doe 2 said that Medrano "touches" her "[e]verywhere," first doing so on the day he returned to her grandmother's apartment, when she was 12 years old. That night, she and Medrano were sleeping in a bottom bunkbed, her sister and her grandmother sleeping above them, when he "did it" to her in the middle of the night. He put his hands on her waist, including under her clothes, pulled down her pants, and put his "private part" in her "private part." As she cried, he covered her mouth with his hand and moved back and forth until he pulled out of her. He gave her a kiss, said he was sorry, and went to sleep.

After this first time, something like it happened "[a] lot," mostly in Doe 2's room. It happened "[m]aybe daily" at their first house and "maybe two times a week" after Adriana moved in, last occurring about a month before the interview.

Medrano also put his private part in her mouth, "maybe twice." She was pretty sure it was at their first house, when she was in ninth or tenth grade and 13 or 14 years old. He used a vibrating object inside her two or three times when they were in the first house, when she was "maybe" 14 years old.

10

When Doe 2 was "maybe" in eighth grade, he tried to put his private part in her "back part" until she pushed him away. She did not know where his private part went that time. Asked "how many times has he tried to do that?" she replied, "Um, just, like, twice." She did not feel anything different in that part of her body afterwards. She was then asked, "Anything, like, you notice ever, like, going to the bathroom or anything like that?" She replied that the day after "the first time," "it was bleeding" and she thought she had started her period, but she had not.

Once, on a trip to Los Angeles, when Doe 2 was 14 years old, she and Medrano were in a room with Doe 1, who was sleeping. Medrano put "it" in "the hole for sex." He did it again when the two of them were in a hotel room in Indio, but she could not recall her age at the time.

Doe 2 first told what Medrano was doing to her friend, Vanessa F. Her sister told her the first day they moved to their second house that Medrano touched her too. That was the same day the three of them were lying in the same bed and Medrano touched Doe 2, flipped over, and every five minutes flipped back to her, touching her chest and at the top of and inside the hole used for sex.

Medrano told Doe 2 not to tell anyone what he did to her because it could cause problems. She felt she shouldn't tell anybody and was waiting until she was 18, when she could move out. But Doe 1 told Fernanda what Medrano was doing, and Fernanda told Adriana. Doe 2 then told Adriana.

Medrano had just returned Doe 2's phone to her on the day of the interview after taking it away because she had a boyfriend.

### E. *Doe 2's Pretext Phone Call with Medrano*

After her CIC interview, Doe 2 participated in a "pretext" phone call with Medrano that was recorded by the Richmond police and played for the jury.

11

The call began with Medrano asking Doe 2 why she was sad and if she wanted to talk, which she said she did.[5]  After confirming that she was in a bathroom and no one was listening, he said he had given her phone to her so she would feel better and did not know what needed to be done so she would get better.  He encouraged her to come home and talk to him, but she said she wanted to talk then.  After saying she should be where no one could listen, he told her he did not take away her phone "because of anything you might have done or not done here in the house with this boy," but for things she and her sister were doing "on Instagram and talking among yourselves and not telling me."

Doe 2 said she did not want to talk about that, but instead wanted to talk "[a]bout what you did."  "Okay.  Look, about what?"  Medrano responded, "That—that I go up to your room?"  "Yeah," Doe 2 said.  After Medrano referred again to what Doe 2 had done in the house and Doe 2 told him he "said that already," Medrano said, "I'm sorry.  But you know that it won't happen—it won't happen.  (Unintelligible) these last few days I just go in, I give you your kiss when I leave, because you're asleep, and nothing else."  They then said the following:

"[Doe 2]:  You promise you won't touch me?

"[Medrano]:  Oh, I swear it on my life and on you and the baby and your little sister.  I promise, but let's talk about it.  I swear it, sweetie.

"[Doe 2]:  I have night—I have nightmares about the time when—if you can say the word 'sex' that's fine.

---

[5] We summarize the conversation from a transcript that was admitted at trial showing what the two said, often but not always in Spanish, and providing an English translation.

"[Medrano]: I don't want to hurt you. I don't want you to suffer anymore. I don't want to suffer—I mean . . .

"[Doe 2]: But if you don't want to, you don't need to. All right?

"[Medrano]: . . . I don't want to do this anymore. I just want to—I want you to be happy, as always.

"[Doe 2]: I don't want you to force me to do sexual stuff. If you can say that.

"[Medrano]: And I'm thinking about (unintelligible) big time.

"[Doe 2]: Okay?

"[Medrano]: It won't happen again. I promise. Do you believe me? I'm going to try to get you to trust me and try to—just want, you know, to make our life better. Because that's what I work for. And I know that I messed up. But it won't happen again.

"[Doe 2]: But, um, wh—why to me?

"[Medrano]: That's what we need to ta—talk about. I don't know. Okay? Let's talk. But not there, 'cause I don't want anybody to know.

"[Doe 2]: But I'm in the bathroom alone.

"[Medrano]: But everybody (unintelligible). You know?

"[Doe 2]: I'm talking.

"[Medrano]: Look, honey. All I can ask you is to forgive me. I swear to you—I truly swear to you, sweetie, that it's never going to happen again. I'm going to support you in everything you want. Mm-hmm? I'll still tell you when you're wrong, but it won't happen again. Believe me, sweetie. Believe me.

"[Doe 2]: But why did you have sex with me?

"[Medrano]: I don't know, honey. Just don't say things right now. Please. Let's talk. Okay? But not—not—not this way.

"[Doe 2]:  No more sex, no more forcing me to do anything, you promise?

"[Medrano]:  Not this way.  I'm going to pick you up.

"[Doe 2]:  So no more touching me?  No more . . .

"[Medrano]:  No more.

"[Doe 2]:  . . . forcing me?

"[Medrano]:  Nothing.  Nothing.  But let me go see you."

After arranging to pick up Doe 2, Medrano added, "Don't tell them anything, okay?"

## F. *Vanessa F.'s Testimony*

Vanessa F. testified that she lived with and was best friends with Doe 2, and had known her since she was in sixth grade.  In December 2017, when Vanessa was 13, Doe 2 texted to her that Medrano was sexually abusing her.[6]  Doe 2 said "she wasn't a virgin anymore because of her dad."  After that, they talked, "[a]bout weekly maybe," and texted for years about Medrano's sexual abuse of Doe 2.

## G. *Medrano's Testimony*

Medrano testified that he had worked construction for 20 to 25 years, was married to Adriana, and had five children.  Doe 1 and Doe 2 first came to live with him when they were five and four years old respectively "[b]ecause they were experiencing a lot of mistreatment from their mother."  When they first arrived, they would play a "sex game and strange things like that."  They did not speak English and had difficulties in school; Doe 1 was left back a grade.

---

[6] The trial court admonished the jury to consider Vanessa F.'s account of Doe 2's statements as evidence that she made a complaint at the time about certain abuse happening, but, since the evidence was hearsay, not for the purpose of the truth.

In December of 2012, Medrano moved to Mexico for a job. The girls stayed in his mother's and brother's two-bedroom apartment and he spoke to them by phone. He returned on June 5, 2016, when Doe 1 and Doe 2 were going to turn 12 and 13 years old respectively. On the first night, he slept in the same room as his mother and two daughters, but not in the same bed. He did not touch Doe 2 sexually or try to lay close to Doe 1.

Two months later, Medrano and his daughters moved to a two-story, three-bedroom house. His mother often visited until she moved to Mexico City about a year later. He then hired nannies to help care for the girls.

Medrano, Doe 1, and Doe 2 lived in this first house for two and a half years. A couple of months after they moved in, a friend of Medrano's lived with them for two months, staying in the living room. Sometime later, a cousin moved in with her family for about six months, staying in Doe 1's room while Doe 1 stayed in Doe 2's bedroom. Also, they had a dog, who slept in Doe 2's room, both in this house and the house they later moved to, whose bark could be heard throughout the house.

Medrano dated several women with whom he had sexual relations when they stayed at the house; in 2018 he met Adriana and later married her. In June or July of 2018, she moved in with her sister, Fernanda, shortly before Angel's birth. Adriana and Medrano shared a bedroom and Fernanda stayed in Doe 1's room. Medrano regularly had sexual relations with Adriana. Doe 1 and Doe 2 got along well with her and Fernanda.

While Ariana was pregnant with Angel, the family moved to their second house, which had one story and three bedrooms. The sleeping arrangements remained the same. Several people stayed at this house, some for months at a time.

15

Angel was born prematurely and remained in the hospital for almost a month, during which time Medrano visited him every night. When Angel came home, he needed extra care, such as being bottle-fed almost every two hours throughout the night.

Medrano took several trips to Los Angeles with his daughters to visit an aunt and also took a trip with Doe 2 and Fernanda to Indio. He slept in the same bed with Doe 2 at his aunt's house because the house was crowded. He did not have sex with Doe 2 during any of those trips.

In 2019, Medrano did not tell his daughters to be uncooperative with visiting social workers. He was not concerned because Doe 2 told him that everything was fine, and that it had something to do with a project at school.

Medrano also recalled Doe 1 seeing him and Doe 2 in Doe 2's bedroom with his hand under Doe 2's blanket. He did not touch Doe 2; rather, she had called him into her room and, sad and watery-eyed, asked him why their mother did not look for them.

Medrano on occasion found Doe 1 and Doe 2 were dishonest with him, and he had problems with their school performances. He initially gave them phones when they lived in their first house, and he required them to leave the phones in his room every night for him to check. He would take their phones away to punish them, which upset them and caused them not to talk to him.

Business was very bad for Medrano in 2020 during the COVID-19 pandemic. He and Adriana had "a lot of problems because of money issues" and "were not doing well anymore." They fought over other issues as well.

In late November of 2020, Medrano found a video on Jane Doe 2's phone which showed her "kneeling down placing her breasts on" the "part" of a boy in her room. Medrano yelled at Doe 2, hit her, and took the girls'

16

phones away. He gave the phones back a couple of days before he was arrested.

Regarding the pretext call with Doe 2, Medrano spoke to her after Adriana, sounding "desperate," called and told him that Doe 2 had locked herself in the bathroom, crying, and wanted to speak to him. When Doe 2 asked him to promise not to touch her anymore, he thought she was referring to his hitting her. That is what he was referring to when he promised not touch her again, asked her to forgive him, and told her not to tell anyone. When Doe 2 asked him why he had sex with her, he responded, "I don't know, my love," because he did not know why she had asked him that and "just didn't know what to say."

Medrano "felt bad" about hitting Doe 2. However, he never touched her or Doe 1 in a sexual manner and never performed sex acts on them.

## H. *The Verdict, Sentencing, and Appeal*

The jury found Medrano guilty on all counts and found all the allegations to be true, except on both counts 6 (forcible rape of Doe 1 when she was 14 years of age or older) and 7 (sodomy by use of force of Doe 1 when she was 14 years of age or older), it convicted him of the lesser included offense of simple battery. The trial court sentenced Medrano to an aggregate term of 520 years to life.

Medrano filed a timely notice of appeal.

## II. DISCUSSION

## A. *The Court Did Not Err in Denying Medrano's In Limine Motion*

Medrano argues the trial court's denial of his in limine motion to present Quezada's testimony remotely via a Zoom video call violated his constitutional rights to present a complete defense and to confrontation under *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) and other authorities because the court, contrary to its assertion that section 977.3

17

controlled, had the inherent authority to allow the presentation of Quezada's testimony via a remote video call, and because that testimony, particularly as it related to the first night he returned from Mexico, was critical to his defense "that the charges against him were fabricated, likely due to family conflict and dysfunction that came to a head in December of 2020, and culminated with his two daughters making the allegations against him and his wife reporting him to the police." He contends the court's error requires reversal of the judgment in its entirety.

We disagree. The trial court's rejection of Medrano's in limine motion did not violate his constitutional rights because his proffer failed to show that Quezada's remote testimony was critical to his defense, given the tangential and cumulative nature of her testimony, or that it was reliable.

### 1. The Proceedings Below

In December 2022, shortly before the trial began, Medrano moved in limine to present the testimony of his mother, Christina Quezada, via a Zoom video call from Mexico to rebut Doe 1's and Doe 2's accounts. He argued the court should allow Quezada's testimony under the Judicial Council's COVID-19 pandemic emergency rules permitting certain witnesses to appear remotely. He contended, via his attorney's declaration, that Quezada otherwise might not be able to testify because she did not have an assured way of timely entering the United States. Relying on *Chambers*, *supra*, 410 U.S. 284, he asserted her testimony "may be vital" to his defense because she "has been identified as a percipient witness to an alleged incident by one of the complaining witnesses and is a potential impeachment witness."

Medrano submitted as an offer of proof a two-page report from an investigator to Medrano's trial counsel recounting the investigator's telephone interview with Quezada in August of 2022. Quezada told the investigator that she lived in Richmond, California before moving to Mexico

18

in late 2016 or early 2017.  In 2008, when Medrano lived with her, his two daughters, Doe 1 and Doe 2, moved in with them.  They were brought from Mexico, where they had lived with their mother, a " 'prostitute' " and " 'drunk' " who had "abandoned" them after leaving them alone for long periods of time and locking them in parts of their home.

Quezada said the girls appeared to be "fine" when they arrived in Richmond, although Jane Doe 2 wet her bed for a " 'long time.' "  Quezada recalled "one incident where she found the girls on top of one another," fully clothed, but appearing to "touch each other in a sexually inappropriate manner."  She did not tell anyone about it and never saw other behavior like it again.

According to Quezada, Medrano went to Mexico in 2013 with a girlfriend in the hope of finding a job.  Does 1 and 2 "missed [him] and would talk to him on the phone."  Medrano did not find a job, broke up with his girlfriend, and returned to her Richmond home in 2016.  He "always slept on the couch or in [a brother's] bedroom.  [Jane Does 1 and 2] slept in [Quezada's] bedroom.  Each of them had their own bed.  [Quezada] recalled that the girls were good sleepers and did not wake up during the night. . . . [Medrano] never slept in [Quezada's] bedroom.  [Quezada] never took any medications or ha[d] any health problems that could alter her consciousness during the night."

Quezada told the investigator that Medrano and the girls lived with her for over a year and then moved elsewhere.  She went to their house daily to care for the girls, 14 and 15 at the time, until she moved to Mexico.  She thought Medrano spoiled the girls because he felt guilty about their childhood, buying them phones at one point over her objection.

19

Quezada said that Medrano, after he married Adriana, had problems with Adriana's sister, Fernanda, because Fernanda did not contribute financially to the household. Eventually, Medrano found a job two hours away and Jane Does 1 and 2 "were mainly home alone or in the care of Adriana." Jane Doe 1 would complain to Quezada that she and her sister always had to care for Medrano's and Adriana's baby and that Adriana "treated them badly."

Quezada also said Medrano, prior to his arrest, "told [Quezada] that he had found the girls with boys that he didn't like. [He] took their phones away. [He] did not have a problem with the girls dating but he wanted to meet the boys and their parents to make sure they were safe. [He] did not like the girls sneaking around behind his back."

At the motion in limine hearing, defense counsel conceded that the circumstances prompting Medrano's motion were not directly related to the COVID-19 pandemic and that the court was not required to permit video call testimony under the Judicial Council's emergency rules.

The prosecutor opposed Medrano's motion. He argued the Judicial Council's rules did not apply and that the governing statute was section 977.3, which did not authorize remote witness testimony in felony trials and, to the extent it did allow remote testimony, required both parties' consent, which the prosecutor would deny.[7]

---

[7] Section 977.3 provided at the time of trial (and continues to provide as the statute has been amended since) that "[a] witness may testify in any misdemeanor or felony criminal proceeding, except for felony trials, through the use of remote technology with the written or oral consent of the parties on the record and with the consent of the court." (Stats 2022, ch. 57, § 14; § 977.3, subd. (a).)

20

Defense counsel responded by arguing that, "[g]iven the extraordinary circumstances," "I think that the due process concerns here would allow the Court . . . to permit this." Otherwise, Medrano would be deprived of Quezada's testimony even though video call technology would allow the jury to "see and hear" her.

The court denied Medrano's motion. It agreed that section 977.3 governed and required the prosecution's consent to Quezada's remote testimony. It rejected Medrano's due process argument because Quezada's remote appearance could "impact the jury's evaluation of the credibility of the witness since they're not able to see them in the same room up close as they are with live witnesses." The court added, "[O]n this record, . . . based on my review of the offer of proof of relevance, I don't find that interpreting 977.3 to require the live testimony of [Quezada] . . . would violate the defendant's due process . . . . [¶] I'm not seeing anything in that particular offer of proof as to what she would say if she testified that would be an equivalent to an exoneration of the defendant. I can understand why the defense would want the witness to testify. . . . But it's not the level of exoneration and I don't find a due process violation."

## 2. Legal Standards

We apply a de novo standard of review because of the constitutional implications of Medrano's argument. (E.g., *People v. Lujan* (2012) 211 Cal.App.4th 1499, 1505 [conducting a de novo review of a constitutional confrontation issue] (*Lujan*); *People v. Sejias* (2005) 36 Cal.4th 291, 304 [when "the relevant facts are undisputed" and "the ruling . . . affects the constitutional right of confrontation," we employ the independent standard of review].)

Medrano rests his analysis on two main legal points.

First, he cites the court's inherent authority to create new trial procedures as discussed in *Lujan*, *supra*, 211 Cal.App.4th 1499. The *Lujan* court considered a trial court order that allowed a frightened seven year old, an alleged witness of child abuse, to testify in a room separate from the courtroom by closed-circuit television. It rejected the defendant's arguments that the order was not authorized by the governing statute and violated his constitutional confrontation rights and affirmed the judgment, holding that the trial court had the "inherent authority to fashion new procedures," including the "authority to order remote testimony," so long as such "procedural innovations" did not violate a statute or the Constitution, or "usurp the Legislature's role by fundamentally altering criminal procedures." (*Id.* at pp. 1503–1504, 1507–1509; see *People v. Arredondo* (2019) 8 Cal.5th 694, 706–707 [citing *Lujan* approvingly]; *People v. Avila* (2011) 191 Cal.App.4th 717, 722–723 ["trial court has inherent supervisory and administrative powers that allow it to create new procedures" not prohibited by statute that are suitable and within the spirit of the code].)

Second, Medrano relies on his federal constitutional rights to present a complete defense. As Medrano argued below, "Few rights are more fundamental than that of an accused to present witnesses in his own defense." (*Chambers*, *supra,* 410 U.S. at p. 302.) Nonetheless, "[a] defendant's right to present relevant evidence is . . . subject to reasonable restrictions" (*United States v. Scheffer* (1998) 523 U.S. 303, 308 (*Scheffer*)), and " '[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.' [Citations.] This latitude, however, has limits. 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution

22

guarantees criminal defendants "a meaningful opportunity to present a complete defense." ' [Citations.]  This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are ' "arbitrary" or "disproportionate to the purposes they are designed to serve." ' " (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324–325; see *Scheffer*, at p. 315 [exclusion of evidence unconstitutional where it "significantly undermine[s] fundamental elements of the accused's defense"]; *Crane v. Kentucky* (1986) 476 U.S. 683, 690–691 [exclusion of "competent, reliable evidence . . . central to the defendant's claim of innocence" without valid state justification violates constitutional due process].)[8]  Thus, a court's exclusion of proffered evidence by the defense violates due process where the evidence is "critical to [the] defense" and, in the case of hearsay, bears "persuasive assurances of trustworthiness." (*Chambers*, at p. 302.)

But "[a]lthough the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.)  "[I]f the exculpatory value of the excluded evidence is tangential, or cumulative of other evidence admitted at trial, exclusion of the evidence does not deny the accused due process of law." (*People v. Smithey* (1999) 20 Cal.4th 936, 996.)

---

[8] The People argue Medrano has forfeited his claim to the extent he bases it on his constitutional right to confrontation because he failed to raise that specific right below.  Given that it is evaluated the same as a due process right here, which Medrano did raise below, we will consider his claim without finding forfeiture of any part of it.

### 3. Analysis of the Merits

Medrano relies largely on *Chambers*, contending it presented circumstances that are very similar to those here. Chambers was tried for murdering a police officer during a bar fight. (*Chambers*, *supra*, 410 U.S. at pp. 285–288.) At trial, he contended another man shot and killed the officer. He introduced into evidence that man's written, signed confession to doing so; however, the man, when called as a defense witness, recanted. (*Id*. at pp. 289, 291.) Chambers sought to impeach him with three witnesses who would testify that the man had confessed to them that he had shot and killed the officer, but the court excluded their testimony as hearsay. (*Id*. at pp. 292–294.)

The Supreme Court held that this exclusion violated Chambers's constitutional due process right to a fair trial because "[t]he testimony . . . bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." (*Chambers*, *supra*, 410 U.S. at p. 302.)

*Chambers* is easily distinguishable, and Medrano fails to show that the other cases he cites involved a proffer of evidence as slight and as questionable in its reliability as Quezada's. Indeed, Medrano did not even argue below that Quezada's testimony was critical; he only argued it "*may* be vital" (italics added) to his defense. Nor is there any indication that Quezada's testimony would be particularly reliable, as she told the investigator that she moved to Mexico at the end of 2016 or in 2017, making most of her information about family dynamics hearsay that she heard from Medrano.

24

Quezada's proffered testimony was tangential to Medrano's defense. As for the importance of her testimony as a "percipient witness" of what occurred on the first night of his return from Mexico in 2016 (Doe 2 alleged Medrano raped her, as charged in count 9), the investigator's summary of what Quezada would say did not include any testimony about that night. Contrary to Medrano's representation that she might be vital to his defense as a "percipient witness" to those events, Quezada gave no indication that she had recollections of *anything* that occurred that night. Medrano only speculates on what she might say, for example contending it was "highly unlikely" the rape Doe 2 described could have taken place without Quezada being aware of it. This is unpersuasive—Quezada could just as easily have been asleep and unaware of anything that occurred.

Quezada's recollections amounted to only the most general of memories about Medrano's activities when he stayed at her apartment, with the girls already there, upon his return from Mexico. Quezada did say that Medrano "always" slept on the couch or in his brother's room, that the girls slept with her in her room, and that Medrano "never" slept in her room. Medrano contends this was critical to his defense against the charge that he raped Doe 2 on the first night of his return from Mexico while he, Doe 2, Doe 1, and his mother slept in the same room, and that this charge was particularly important to the overall charges against him because it was the only one based on a specific day and was the first of the girls' many allegations. But Quezada's general recollection appears to be just that—Medrano himself testified that he *did* sleep in the same room with Quezada and the girls on the first night of his return. Thus, Medrano fails to show Quezada's proffered account was critical to his defense.

Medrano also argues that Quezada's recollection that she once saw Does 1 and 2, apparently soon after they arrived at four and five years old, on top of each other fully clothed but appearing to touch each other in a sexually inappropriate manner was significant to his defense. We fail to see its significance. At best, it was one incident when the girls were very young, occurring years before the events occurred that underlaid the charges against him, as Quezada did not observe this behavior again. And Medrano offered no reasoned explanation based on evidence (for example, the testimony of an expert psychologist) for why this one event is important to his theory that the girls fabricated years of sexual abuse by him against them.

Further, although the investigator recounted that Quezada said that she visited the family often after they moved from her apartment, the investigator did not indicate Quezada personally witnessed his conduct with the girls at night, or personally witnessed any conduct or family dynamics after she moved to Mexico in late 2016 of in 2017. *That* conduct was the basis for most of the charges against him. Quezada's testimony was necessarily based on hearsay, likely largely from Medrano himself, and as such was of little significance to the defense theory that broken family dynamics led to the girls fabricating their charges against Medrano.

Also, much of Medrano's proffer was cumulative of other evidence that was introduced at trial. For example, Quezada's description of much of the timeline and/or her account of Medrano giving Doe 1 and Doe 2 phones and his disciplining of them, was testified to by Doe 1, Doe 2, and Medrano, and also mentioned by Medrano in the pretext call with Doe 2.

That Quezada was largely absent from Medrano and the girls also undermines Medrano's claim that her testimony would be sufficiently reliable. It may have been possible for the court to fashion satisfactory

26

procedures for remote testimony to be presented to the jury. (See *People v. Coulthard* (2023) 90 Cal.App.5th 743, 773–775 [court's approving of remote testimony of a key prosecution witness during the COVID-19 pandemic did not violate defendant's confrontation rights because allowing the remote testimony advanced an important public health policy and the court took steps to ensure it "was reliable and subject to adversarial testing" on cross-examination].) But Medrano fails to grapple with the fact that, as we have discussed, there is no evidence that Quezada was ever present at night after Medrano and the girls moved out of her apartment or present at all in the family's life after she moved to Mexico, by her own account, in late 2016 or in 2017. Necessarily, therefore, much of Medrano's proffer about what she would say about family activities and dynamics involved hearsay and, likely, much of it came from Medrano himself. Medrano offers no explanation why the typical hearsay rules should not apply to such questionable hearsay testimony. (Cf., *Chambers*, *supra*, 410 U.S. at p. 302 [concluding "[t]he testimony . . . bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest"].)

And indeed, there were further indications that her testimony was not particularly reliable. For example, she said Medrano and the girls lived with her for more than a year after he returned from Mexico when their own accounts indicated it was for a much shorter period of time.

Medrano points out that, contrary to the trial court's stated analysis in support of its ruling, his proffered evidence need not "exonerat[e]" him in order to be admitted. As we have discussed, the standard is something less than exoneration, but nonetheless, it must be critical to the defense and, particularly in the case of hearsay, have indicia of reliability. And in any

27

event, we " 'review the ruling, not the [trial] court's reasoning,' " and affirm " 'if the ruling was correct on any ground.' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11 (*Zamudio*); accord, *People v. Brooks* (2017) 3 Cal.5th 1, 39.)

In short, Quezada's proffered remote testimony was not critical to his defense and involved a great deal of not particularly reliable hearsay. The trial court's rejection of Medrano's in limine motion is easily distinguishable from the cases Medrano cites in support of his argument—such as the proffered evidence of the defendant's multiple confessions to the charged crime in *Chambers*. Because Quezada had little to offer that aided the defense, the court acted well within the boundaries of constitutional law in denying Medrano's motion.[9]

### 4. Any Error Was Harmless

Assuming solely for the sake of argument that the trial court did err in denying Medrano's in limine motion, we conclude the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. As we have already discussed, Quezada's proffered testimony was tangential to the issues underlying the charged crimes, rooted largely in unreliable hearsay, and cumulative. On the other hand, there was strong evidence of Medrano's guilt.

Doe 1's and Doe 2's trial testimony was largely consistent with their CIC interviews from two years before and included considerable detail regarding Medrano's actions. Their accounts of his assaults were measured in describing what and when he assaulted them. For example, Doe 1 claimed

---

[9] Medrano does not otherwise challenge the trial court's determination that he was not entitled to present remote testimony under section 977.3. Therefore, we have no need to address that part of the court's ruling.

28

he only sodomized her once, that he did not come to her room when she shared it with Fernanda, and that he did not inappropriately touch her at all in their second house.  Doe 2 detailed where he touched her and where his assaults occurred, indicated his acts of sodomy were limited, and acknowledged that he stopped his assaults for brief periods of time.  Both girls testified to specific memories of his assaults.  Doe 2 also acknowledged that he disciplined them, took away their phones, hit her, and that she was annoyed by his overprotectiveness.  The jury obviously found the girls credible.  We see nothing in Quezada's proffered testimony that might affect that credibility determination.

There were further indicia of credibility.  Both Doe 2 and Vanessa F. testified that Doe 2 had disclosed Medrano's sexual assaults to her regularly and for years, and Doe 2 disclosed that she had been sexually abused (although she did not identify Medrano as the perpetrator) in a school report in 2018 or 2019.  Further, Adriana, and not Doe 1 and Doe 2, contacted the police.  This indicates that, contrary to Medrano's defense, they were not out to get Medrano for his disciplinarian ways.

If all of this were not enough, Medrano made statements in the pretext phone call with Doe 2 that unquestionably indicate he had repeatedly sexually assaulted her.  While he contended at trial that his statements in the call were about his hitting Doe 2 rather than sexually assaulting her, the transcript indicates otherwise.  In the call, after Medrano refers to his discipline of her, Doe 2 tells him she does *not* want to talk about that, but instead wants to talk "[a]bout what you did."  Medrano responds, "That—that I go up to your room?" and Doe 2 says yes.  This clearly is not about his striking her or taking away her phone, but about his nighttime visits to her

29

bedroom, i.e., his sexual assaults.  It sets the stage for the rest of their discussion.

Medrano immediately apologizes and promises that "it won't happen again," and points out that he has in the last few days merely kissed her good night "and nothing else."  Doe 2 then, in the context of Medrano's nighttime visits to her bedroom, asks him to promise that he "won't touch me."  He swears that he won't.  She refers then to " 'sex,' " to which he says he does not want to hurt her, and that he doesn't "want to do this anymore."  She says she does not want him to force her to do "sexual stuff," and, after he says something unintelligible and Doe 2 insists on an answer, he says, "It won't happen again.  I promise. . . . And I know that I messed up.  But it won't happen again."  She then asks, "[W]hy to me?"  He indicates they should talk about it in person and when she persists, seeks her forgiveness and promises it won't happen again.  She then asks, explicitly referring to sex for the third time in a just few minutes, "But why did you have sex with me?"  He says only, "I don't know honey.  Just don't say things right now."

The only reasonable conclusion from this transcript is that Medrano was talking, however guardedly, about his repeated sexual assaults of Doe 2.  His contention otherwise is not plausible.

Medrano also contends his was a "a close case" based on the jury's failure to convict him as charged of two counts, the multiple questions asked by the jury during deliberations, and its request to hear a readback of part of Doe 1's testimony.  This too is unconvincing.  Medrano was convicted of 30 of the 32 charged crimes, and found to have committed the lesser included offense of simple battery against Doe 1 for the remaining two.  The jury's questions were about procedure, other than a request to review part of Doe 1's testimony to determine when and where she said Medrano first sexually

30

assaulted her.  They do not indicate the jury considered this to be a close case.

In addition to our rejection of Medrano's constitutional arguments on the merits, we conclude in the alternative that any such error was harmless beyond a reasonable doubt.

**B.** ***Medrano's Convictions for Counts 1, 2, and 13 Are Supported by Substantial Evidence***

Medrano next argues there was insufficient evidence to convict him of raping Doe 1, sodomizing Doe 1, and sodomizing Doe 2 when they were under 14 years old (counts 1, 2, and 13 respectively).  We disagree.

### 1.  Legal Standards

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one.  ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, 43 Cal.4th at p. 357.)

" 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for

31

substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)

Here, Doe 1 and Doe 2 testified that Medrano sexually assaulted them over a period of years but did not state specific dates. In such a circumstance, we evaluate the evidence under *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*). In *Jones*, our Supreme Court considered the quantum of proof needed to convict in a child molestation case. (*Id*. at pp. 314–316.) It cited with approval the analysis in *People v. Moore* (1989) 211 Cal.App.3d 1400, in which "[t]he victim's testimony . . . outlined a series of undifferentiated rapes 'almost every night' " for a period from June 1 through August. (*Id*. at p. 316.) The *Jones* court held that such testimony, despite its "generic" nature, could support a conviction because exact details of time and place and the like are not elements of the crime and, therefore, unnecessary to sustain a conviction. (*Id*. at pp. 312–316.) To provide substantial evidence, the child victim merely must describe (1) "*the kind of act or acts committed* with sufficient specificity" to assure that unlawful conduct indeed "occurred and to differentiate between the various types of proscribed conduct"; (2) "the *number of acts* committed with sufficient certainty to support each of the counts alleged . . . (e.g., 'twice a month' or 'every time we went camping'); and (3) "*the general time period* in which these acts occurred (e.g., 'twice a month' or 'every time we went camping'), to assure the acts were committed within the applicable limitation period." (*Id*. at pp. 315–316, original italics.) "Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the

victim's testimony, but are not essential to sustain a conviction." (*Id*. at p. 316.)

## 2. Medrano's Convictions for Counts 1 and 2 Are Supported by Substantial Evidence

Medrano argues we must reverse his convictions for counts 1 and 2 because of the lack of evidence that Doe 1 was under 14 years old at the time of those alleged crimes. He bases this on his contentions that Doe 1 testified only to "a single incident," in which he had both vaginal and anal sex with her, that conceivably might have occurred when she was under 14 years of age; that she could not remember when this incident took place beyond it occurring in the first house, where she lived both before and after turning 14 years old; and that she indicated in her CIC interview that, for this incident and for those she recalled in which he had vaginal sex with her (she recalled two or three times total), she was already a freshman in high school at the time and, according to Medrano, already 14 years old; further, he says, even if Doe 1 indicated she had her own room at the time that he raped and sodomized her in his bedroom, from which it could be inferred that it was before she began sharing her bedroom with Fernanda, evidence indicates that Fernanda (and Adriana) moved into the house in 2018, after Doe turned 14 in November 2017. All of this, in Medrano's view, shows that the evidence was insufficient to show beyond a reasonable doubt that he raped and sodomized Doe 1 prior to her 14th birthday.

Medrano's contentions are nothing more than a request that we reweigh the evidence and reevaluate the credibility of conflicting testimony, neither of which is within our authority to do under a substantial evidence standard of review. Again, "[u]nder this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party,

33

drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) Further, "[a] single witness's testimony may constitute substantial evidence to support a finding. [Citation.] It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility." (*Ibid.*)

In a case such as this, where the complaining witnesses were 12 and 13 years old when the alleged assaults began occurring, and which continued for some years in their home when they were alone with their assailant, it is not uncommon for such witnesses to be less than precise about the dates that events occurred, to give conflicting and sometimes confusing evidence, and for fact finders to have to sort through this evidence to determine what happened when. Such is the case here.

We conclude a rational fact finder could find substantial evidence that Medrano raped and sodomized Doe 1 before she turned 14 years old as follows: Doe 1 testified that she was born in November 2003. Medrano testified that he moved back to his mother's house from Mexico on June 5, 2016—when Doe 1 would have been 12 years old. A couple of months later, as testified to by Medrano (who said two months), Doe 1 (who said probably a couple of months), and Doe 2 (who said a few months), the three moved to their first house. According to Doe 2's testimony, Adriana and Fernanda moved into this house, "[a] few months, but I'm not sure if it was like a whole year later. But maybe it was a year"; therefore, by Doe 2's account, Doe 1 began sharing her bedroom with Fernanda no earlier than August 5, 2017, when she a little less than 13 years and nine months old. But Doe 1 testified that she had her own room in the first house when Medrano raped and sodomized her in his bedroom. Based on this substantial evidence, a rational fact finder could conclude that Medrano raped and sodomized Doe 1 in his

34

bedroom no later than August 5, 2017, when she began sharing a bedroom with Fernanda. At that time, given her birthdate of November 12, 2003, she was still 13 years old.

Granted, there is arguably conflicting evidence, including Doe 1's own statement in her CIC interview that she was a freshman when Medrano raped and sodomized her in his room, suggesting she was in ninth grade at the time, after having been left back a grade early in her schooling. But again, "[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Thus, we will not follow Medrano's suggestion that we reevaluate the credibility of conflicting testimony, as he gives us no reason to conclude the testimony supporting his conviction was so inherently improbable that a rational juror could not rely on it.

Medrano also cites some remarks in the prosecutor's closing arguments about the evidence in support of his claim. But the trial court instructed the jury that "[n]othing the attorneys say is evidence" and that their closing argument remarks "are not evidence." Rather, the court told the jury, "You must decide what the facts are. It is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial." We presume the jury followed these instructions. (*People v. Alvarez* (2025) 18 Cal.5th 387, 458.)

Medrano also contests, unconvincingly, the "arithmetic" employed by the People regarding the dates we have cited. He contends the dates show

only that "Adriana and Fernanda might have moved in before Doe 1's 14th birthday, but just as easily could have moved in after that" and, therefore, are not substantial evidence of evidence beyond a reasonable doubt. We disagree; as our recounting of the evidence indicates, a rational fact finder could determine from substantial evidence that they moved in before Doe 1 turned 14.

In sum, Medrano's claims regarding counts 1 and 2 lack merit. There is substantial evidence of evidence beyond a reasonable doubt of the kind of acts (rape and sodomy) that he committed against Doe 1; that he committed each one once in his bedroom in the first house; and that he did so before August 15, 2017, when Doe 1 was still 13 years old. Under the *Jones* standard (see *Jones*, *supra*, 51 Cal.3d at pp. 315–316), his convictions for counts 1 and 2 are supported by substantial evidence.

### 3. Medrano's Conviction for Count 13 Is Also Supported by Substantial Evidence

Medrano argues there are two reasons why the evidence is insufficient to support his conviction for count 13, the sodomy of Doe 2 when she was under 14 years of age. First, the evidence shows that he sodomized Doe 2 only once, when she was at least 14 years old, and this was the basis for his count 31 conviction. Second, if we conclude Doe 2's CIC interview provides substantial evidence that he also attempted to sodomize Doe 2 before she turned 14, there nonetheless is not evidence of the "slight penetration" needed to support a sodomy conviction. We again disagree with him based on substantial evidence, in this case Doe 2's CIC interview.

In count 13, Medrano was charged under section 269, subdivision (a)(3) with the aggravated sodomy of Doe 2 when she was under 14 years old. To prove this crime, the prosecution had to show he penetrated Doe 2's anal opening, however slightly. (§ 269, subd. (a)(3) [prohibiting sodomy in

violation of § 286, subd. (c)(2) or (3) or subdivision (d)]; § 286, subd. (a) [sodomy is "sexual conduct consisting of contact between the penis of one person and the anus of another person" and requires "[a]ny sexual penetration, however slight"]; § 289, subd. (k)(1) [" '[s]exual penetration' is the act of causing the penetration, however slight, of the . . . anal opening of any person . . . for the purpose of sexual arousal, gratification, or abuse . . . ."]; *People v. Paz* (2017) 10 Cal.App.5th 1023, 1033 [§ 289 definition of sexual penetration applies to § 286].)

As we have discussed, Doe 2 testified that she was born in October 2004. In her December 2020 CIC interview, she said that when she was "maybe" in eighth grade, Medrano tried to put his private part in her "back part" until she pushed him away. She did not know where his private part went that time. Asked "how many times has he tried to do that?" she replied, "Um, just, like, twice." Asked if she felt anything different in that "area" afterwards, she said no. She was then asked, "Anything, like, you notice ever, like, going to the bathroom or anything like that?" She replied that the day after "the first time," "it was bleeding" and she thought she had started her period, but she had not.

There is substantial evidence that Doe 2 was under the age of 14 at the time of this incident. She testified that in 2018 or 2019, when she was a freshman, she spoke with a social worker about her disclosure in school that she had been sexually abused. Also, a social worker testified that she received such a referral in February 2019 and spoke to Doe 2 and Medrano at that time. From this, a rational fact finder could conclude that Doe 2 was in eighth grade—when she said the aggravated sodomy incident occurred—the year before, in 2017 and the first half of 2018, when she was 12 to 13 years old. There is also substantial evidence of at least a slight penetration of the

anus during this incident; such penetration can be reasonably inferred from Doe 2's statement that she was bleeding the day after "the first time."

Doe 2 also testified at trial that Medrano sodomized her when they lived at the second house, which apparently was the basis for the jury's guilty verdict for count 31. Medrano contends the evidence indicates this was the only sodomy incident. He argues that Doe 2's CIC interview statements indicating that he tried to sodomize her "twice," and her reference to a "first time," do not show otherwise. According to Medrano, Doe 2 was merely indicating Medrano tried twice during the same incident to sodomize her, and that she was referring to vaginal penetration when she mentioned "the first time," rather than to bleeding from the anus.

We reject Medrano's contentions because they are in effect another request that we reweigh the evidence. The somewhat jumbled nature of Doe 2's CIC interview as shown in the transcript does not make completely clear to what she is referring. Nonetheless, we disagree with Medrano's reading. A rational fact finder could conclude that Doe 2 was referring to the "first time" Medrano attempted to sodomize her, and that he did so "twice," thereby indicating there were two separate incidents.

Also, importantly, Medrano ignores that the jury concluded two sodomy incidents occurred after reviewing not only the transcript, but also the video of Doe 2's CIC interview. Medrano has failed to include *that* evidence in the appellate record. "Error must be affirmatively shown. [Citation.] The party appealing has the burden of overcoming the presumption of correctness. For this purpose, it must provide an adequate appellate record demonstrating the alleged error. Failure to provide an adequate record on an issue requires that the issue be resolved against the appellant." (*Defend Bayview Hunters Point Com. v. City and County of San Francisco* (2008) 167 Cal.App.4th 846, 859–

38

860; see *Statz v. Eisenberg* (2010) 190 Cal.App.4th 1032, 1039 [appellant has the obligation "to present a complete record for appellate review, and in the absence of a required reporter's transcript and other documents, we presume the judgment is correct"].) Given the absence of the video in the record, we have no basis to second-guess the jury's conclusions.

Accordingly, we conclude that Medrano's claim regarding count 13 lacks merit under the governing substantial evidence standard of review.

## C. *Medrano's Count 7 Sentence Should Be Stayed Pursuant to Section 654*

Finally, Medrano argues that we must stay under section 654 the 180-day sentence the trial court imposed for his conviction on count 7, for the simple battery of Doe 1, because it was based on the same act underlying his count 2 sodomy conviction. The People agree. We do as well.

Section 654 provides that an act "punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act . . . be punished under more than one provision." (§ 654, subd. (a).)

The prosecution, in counts 2 and 7, alleged that Medrano sodomized Doe 1 when she was under the age of 14 and when she was age 14 or older. Doe 1 testified at trial that Medrano once, in his bedroom, put his penis in her vagina. In her 2020 CIC interview, she said that once, at their first house, she was in Medrano's room watching television with him when he put his penis in her butt. The prosecutor told the jury that the evidence established that Medrano sodomized Doe 1 once when she was under the age of 14 as alleged in count 2, but that if the jury found that one act occurred when she was over 14 years of age, it could convict him of count 7.

The jury convicted Medrano on count 2 and of the lesser included offense of simple battery for count 7. The court sentenced him to a term of 15

years to life for count 2, to run consecutive to the count 1 sentence, and to a sentence of 180 days in jail for count 7, to run concurrent to the count 1 sentence, and awarded 180 days of custody credits.

Thus, it appears that Medrano's convictions for counts 2 and 7 were based on the same act. The sentence imposed for count 7 should have been stayed. (*People v. Jones* (2012) 54 Cal.4th 350, 353.) Medrano requests a remand for resentencing, but we may modify the judgment ourselves to stay the count 7 sentence (see, e.g., *People v. Lopez* (2004) 119 Cal.App.4th 132, 139). We shall do so.

## III. DISPOSITION

The judgment is affirmed except that the 180-day sentence imposed for count 7 is stayed. The trial court is ordered to prepare an amended abstract of judgment that shows this modification and send it to the California Department of Corrections and Rehabilitation.

STREETER, J.

WE CONCUR:

BROWN, P. J.
MOORMAN, J.*

---

\* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

40